UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

|                  |                              |
|------------------|------------------------------|
| Plaintiff,       | Case Number 24-20640         |
| v.               | Honorable David M. Lawson    |

MARVIN GREGORY,

Defendant.
_____/

### OPINION AND ORDER DENYING MOTIONS TO SUPPRESS EVIDENCE

Defendant Marvin Gregory is charged with money laundering and possessing methamphetamine.  Some of the evidence against him will come from a warrantless search of an automobile in which he was a passenger and the execution of a search warrant at his house.  He has filed a motion to challenge the automobile search, contending that the government agents had no proper cause to stop the car.  He filed a second motion arguing that the search warrant affidavit was not sufficient to justify the home search.  The Court held an evidentiary hearing on January 29, 2026 at which a Drug Enforcement Agency task force officer testified.   Based on the evidence presented at the hearing and the submissions of the parties, the Court is satisfied that the agents had probable cause to stop and search the automobile, and the search warrant affidavit established probable cause to search the house.  The motions will be denied.

I.

The charges in this case stem from an investigation of a drug trafficking organization that sold illegal drugs originating in Mexico.  Many of the facts that the agents relied on to search the automobile also were presented in the search warrant affidavit (along with some others) for the home search.  At the hearing, City of Warren police officer Charles Springer summarized those facts based on information shared among task force members and his own observations.  The

search warrant affidavit was signed under oath by DEA special agent Jacqueline Gilliam. Springer's narrative covers the local investigation that began in November 2019, culminating in the execution of the search warrant on December 21, 2020.  Before then, Gilliam's investigation in this case focused on an organization suspected of trafficking large quantities of drugs to Detroit and other U.S. cities in concert with a Mexican drug cartel.

The investigation was initiated after a traffic stop on an unspecified date resulted in the seizure of seven kilograms of fentanyl, 1.5 kilograms of methamphetamine, and an unspecified quantity of heroin.  During the investigation, Sanchez Alcaraz and Hugo Ortiz were identified as the "main facilitators" of the trafficking organization in the Detroit area.  Defendant Marvin Gregory was identified as one among four narcotics couriers for the organization, who were suspected of regularly delivering drug sale proceeds to Alcaraz and Ortiz.  Warrant Aff. at PageID.340-41.

According to the affidavit, in November 2019, investigators seized approximately $450,000 in U.S. currency from the Mexican drug trafficking organization, which was packaged and labeled in a manner consistent with how cash proceeds of drug trafficking are handled.  *Id.* at 341.  Springer testified that he participated in surveillance on February 26, 2020, which focused on the two "Hispanic males," Alcaraz and Ortiz.  Group 8 task force members saw Alcaraz and Ortiz meet with defendant Gregory near 17557 Snowden Street in Detroit.  The agents saw Alcaraz and Ortiz get out of their vehicle, a white Ford F-150 pickup truck, and meet with Gregory.  *Id.* at 342.  Gregory took a box from the trunk of his vehicle, a Kia Soul, and he gave the box to Ortiz, who put it in the pickup truck.  Gregory spoke briefly with Alcaraz and Ortiz, and then the men got back in their respective vehicles and left.  The Kia Soul was found based on a vehicle license

check to be registered to defendant Marvin Gregory's wife, Tracy Gregory, at an address on Manor Street in Detroit.  *Id.* at 342-43.

Three days later, on February 29, 2020, Alcaraz and Ortiz were seen by agents meeting with He Huang and Xianglian Wang, who were suspected of being money launderers.  *Id.* at 343. Springer testified that the two "Asian males" met the two "Hispanic males" on Oldham Street in Taylor.  While Huang and Wang remained in their vehicle, Ortiz was seen walking back and forth several times between their car and the same white Ford F-150 pickup.  When both vehicles left the area, agents followed Huang and Wang to a Chase Bank in Brownstown, Michigan.  Huang removed a green wheeled suitcase from the trunk of the vehicle and rolled it into the bank, where Huang and Wang proceeded to unload from the suitcase onto the customer counter what appeared to be approximately $450,000 in currency which was given to a teller to deposit.  *Ibid.*

On March 4, 2020, Group 8 agents saw Alcaraz and Ortiz parked in the same white F-150 pickup truck at 17557 Snowden Street along with the Kia Soul.  Ortiz got out of the truck, and Gregory got out of the same Kia Soul that was seen before, removed a box from the trunk of the car, and went with Ortiz to the rear of the pickup truck, where it was placed into the truck bed.  *Id.* at 344.  While observing the meetup, agents identified the driver of the Kia Soul as Tracy Gregory, who they knew to be the registered owner of the car and defendant Marvin Gregory's wife.  On the following day, March 5, 2020, investigators drove past the Manor Street residence and saw the same Kia Soul vehicle parked in the driveway of the residence.  *Ibid.*

On March 7, 2020, three days after the Snowden Street meetup, agents saw Alcaraz and Ortiz leave their residence in the white F-150 and drive to a meeting with two persons, one identified in the affidavit as "Person 3," and the other named Tao Chen.  *Id.* at 345.  Springer testified that Ortiz took a box out of the F-150 and gave it to Chen and his companion, then got

back in the truck and left the area.  Chen and his partner then went to a Bank of America in Westland, Michigan, where they were observed depositing approximately $100,000 in U.S. currency.  *Ibid.*  The agents concluded that the money came from the box that Gregory had delivered on March 4.

Once again, on March 13, 2020, agents observed another similar meetup between Alcaraz, Ortiz, and Gregory on Snowden Street.  Before the meeting, the agents saw Gregory drive into a Target parking lot, circle, then leave.  Springer characterized that behavior as a well-known countersurveillance tactic.  Once on Snowden Steet, they saw Gregory again hand off a box to Ortiz.  *Id.* at 345-46.  Three days later, on March 16, 2020, Alcaraz and Ortiz met up with an undercover investigator posing as a money launderer.  Ortiz walked up to the undercover officer's vehicle and ask for a token — a dollar bill with a specific serial number.  Ortiz then passed a shoebox with approximately $150,000 from the pair ostensibly to be laundered.  *Id.* at 346.

On April 15, 2020, agents observed defendant Gregory depart the Manor Street residence in his wife's Kia Soul.  *Id.* at 346.  Gregory drove to downtown Detroit, where he picked up his wife at her place of work.  Ms. Gregory was seen getting into the car carrying only her purse.  The pair then began driving toward Snowden Street where the previous meetups had occurred.  Around the same time, Alcaraz and Ortiz were seen leaving their residence in the white F-150 pickup; they were followed and seen driving to and parking at the same area of Snowden Street where the prior meetups had occurred.  *Ibid.*  The Kia exited the Lodge Freeway at Seven Mile Road without signaling the lane change.  Agents then conducted a traffic stop of the Kia Soul, after purportedly observing the traffic violation (failing to signal at a freeway exit), although Springer testified that they had planned to stop the Kia based on the activity that they had observed on Snowden Street over the past several weeks.  When the agents approached the vehicle, officers saw three cardboard

boxes on the back seat of the car, secured with clear tape.  Through a seam in one of the boxes, a large quantity of U.S. currency was visible.  *Id.* at 347.  Gregory produced his identification and volunteered that he had an outstanding traffic warrant.  His wife consented to the officer searching the vehicle "for weapons."   When opened, the boxes were found to contain approximately $450,000 in U.S. currency.  *Ibid.*  Officers called a K-9 unit to the scene who signaled a positive alert to the presence of narcotics in the vehicle.  Gregory was released on the traffic warrant.

On December 8, 2020, DEA Special Agent Gilliam applied for a warrant to search the Manor Street home in Detroit, which was described as the residence of defendant Gregory.  Authorization was sought to search for paraphernalia related to drug trafficking, books and records relating to drug dealing, currency and records of currency transactions related to drug dealing, travel and shipping documents, cell phones and other electronic devices, firearms, and any safes, lockboxes, or other secured containers that could contain any of the above.  Warrant Aff., ECF No. 107-2, PageID.352-54.  In the affidavit, Gilliam recited the facts discussed above, together with additional facts that developed in the months following the traffic stop.

Gilliam attested generally to her training and experience investigating drug trafficking organizations and her knowledge that persons involved in such criminal investigations tend to handle large quantities of cash and to maintain records of their dealings, which often are kept in secured locations within their residences.

In addition, Gilliam stated that on June 1, 2020, during a checked baggage inspection at the Detroit Metropolitan Airport, a person identified as "Person 4" was interviewed and consented to a search of his luggage and cell phone.  *Id.* at 347-48.  Approximately $18,000 in currency was found in Person 4's backpack secured with hair bands.  *Id.* at 348.  Person 4 provided his Michigan driver license, which showed his address as the same Manor Street residence where Gregory lived

with his wife. *Ibid.* Person 4 was asked why he had an empty duffle bag in his luggage, and he said that he "borrowed it from a friend who was a possible narcotics trafficker." *Ibid.* Based on the prior seizure of money from Gregory's vehicle and the fact that Person 4 provided an address matching Gregory's, agents suspected that Gregory had arranged with Person 4 to alter the routing of drug proceeds for laundering to evade further seizures.

On September 2, 2020, agents with DEA Chicago Task Force Group 24 were alerted to a "suspicious travel itinerary" for the same Person 4 described above. Person 4 was booked on an Amtrak train from Detroit, Michigan to Houston, Texas through Union Station in Chicago, Illinois. The ticket was purchased by Tracy Gregory and originally was booked on August 27, 2020 with a departure on the same date. *Id.* at 349. Person 4 was detained and interviewed by investigators. During the interview he produced an expired Michigan driver license with the same Manor Street address listed as his residence. He was asked about his reasons for travel and said he had been visiting family in Detroit. He was asked if he had any large amount of currency in his luggage and he said no. Person 4 then consented to a search of his luggage, and more than $34,000 was found therein and seized. *Ibid.*

Finally, on November 16, 2020, Person 4 was seen at the Manor Street residence in a Dodge Challenger with a Texas license plate registered to an address in Houston, Texas. Person 4 was spotted several more times at the home during the following week. *Id.* at 350.

The search warrant was executed on December 21, 2020, and the home was searched by officers attached to Group 8 Task Force. Warrant Return, ECF No. 107-4, PageID.349. Defendant Gregory was present at the home and was detained while the search was executed. From a safe in a second-floor walk-in bedroom closet and elsewhere in the home, agents recovered more than 500 grams of cocaine, two cell phones, and an indeterminate amount of U.S. currency.

On February 6, 2025, Gregory was charged with eight codefendants with conspiracy and substantive money laundering counts and possession with intent to distribute methamphetamine. He argues in his motion to suppress the evidence from the vehicle search that the agents did not have reasonable suspicion to stop the car, and the warranted home search was unlawful because the search warrant affidavit did not establish probable cause to conduct the search.

## II.

Let's start with the warrantless stop and search of the automobile.  Gregory "vigorously disputes" that his wife failed to signal before exiting the freeway, as allegedly observed by the officer who pulled her over, and therefore the initial stop was illegal.  Next, he argues that even if the initial stop was lawful, it was impermissibly extended after the car was pulled over, because after the defendant was arrested on an outstanding warrant, there was no reason to prolong the stop further and conduct a search of the vehicle.  He also contends that, notwithstanding consent by defendant's wife to a search of the vehicle "for weapons," the search exceeded the scope of her consent when it extended to opening boxes on the back seat of the car, for which officers were required to obtain a separate warrant authorizing the intrusion.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 280 (6th Cir. 2018) (quoting U.S. Const. amend. IV).  Searches and seizures generally are "unreasonable if [they are] not conducted pursuant to a warrant issued upon probable cause." *Ibid.* (citing *Camara v. Municipal Court of City & County of San Francisco*, 387 U.S. 523, 528-29 (1967)).  The seizure of the items from the Kia that Gregory wants suppressed in this case was accomplished without a warrant.  Typically, the warrantless seizure of personal property is unreasonable.  *See United States v. Place*, 462 U.S. 696, 701 (1983).

However, a well-recognized exception to the warrant requirement covers a search of an automobile. "Under the automobile exception to the Fourth Amendment's warrant requirement, officers may conduct a warrantless search of a vehicle if they have probable cause to believe that the vehicle contains evidence of a crime." *United States v. Watson*, 142 F.4th 872, 881 (6th Cir. 2025) (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Peake-Wright*, 126 F.4th 432, 438 (6th Cir. 2025)). Where probable cause exists to search the interior of a vehicle, "officers [are] permitted to search the entirety of [the] vehicle, including any containers found inside the vehicle, without a warrant." *Ibid.* (citing *Acevedo*, 500 U.S. at 570).

The Sixth Circuit has observed that the "question [of] what an officer must demonstrate to establish a probable cause nexus justifying the issuance of a search warrant [] is a familiar one," but, nevertheless, one "undertake[n] [] without a 'neat set of legal rules.'" *United States v. Sanders*, 106 F.4th 455, 461 (6th Cir. 2024) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983) ("[P]robable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.")). "The standard for probable cause, the Supreme Court has observed, is 'incapable of precise definition or quantification into percentages,'" and "[s]o in describing the concept, the Supreme Court often speaks in generalities. 'Probable cause,' it has explained, 'exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Ibid.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *United States v. Grubbs*, 547 U.S. 90, 95 (2006)) (cleaned up). To put it another way, it "requires 'reasonable cause' or 'reasonable grounds to believe' that contraband will be located on the property to be searched." *Ibid.* (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 557 n.6 (1978)). "[W]hatever nomenclature one uses to describe

the concept, probable cause, at its core, 'depends on the totality of the circumstances.'" *Ibid.* (quoting *Pringle*, 540 U.S. at 371). This is inherently a "fact-intensive inquiry." *Ibid.*

Here, the defendant's arguments about the legality of the initial traffic stop, that the roadside stop was illegally prolonged, and that the search of the vehicle exceeded the scope of his wife's consent are largely beside the point. Instead, the main question is whether the circumstances known to agents who conducted the stop were sufficient at a minimum to create reasonable suspicion for an investigative detention of the vehicle, which matured into probable cause when a box containing money was observed in plain view, all justifying a full search of the car. The record plainly yields an affirmative answer.

Of course, "[i]t is well settled that a police officer may conduct a traffic stop when the officer has probable cause to believe that a traffic violation has occurred." *Watson*, 142 F.4th at 877-78 (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). "If an officer has probable cause to believe that a traffic violation has occurred, the stop is permissible 'regardless of whether this was the only basis or merely one basis for the stop.'" *Ibid.* (quoting *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996)). The validity of the traffic stop is irrelevant, however, because other facts previously uncovered during the investigation gave rise to both reasonable suspicion for an investigative detention and probable cause to stop and search the vehicle for contraband currency.

There was an ample factual basis developed through surveillance of Gregory and his alleged co-conspirators to support probable cause for a seizure and search of the Kia Soul in which Gregory was a passenger on April 15, 2020. For this analysis, it is logical to work backwards to establish the chain of occurrences that demonstrates a nexus between illegal currency laundering and the subject vehicle.

Gregory does not attack the sufficiency of the factual basis for investigators' belief that he personally was involved in money laundering connected with drug trafficking.  Nevertheless, the facts in the record (limited to those that preceded the vehicle search) suffice to demonstrate "a fair probability that contraband or evidence of a crime [would] be found" in the vehicle.  *Sanders*, 106 F.4th at 461 (quotations omitted).

First, the search warrant affidavit confirms that agents began their investigation after kilogram quantities of fentanyl and heroin were seized during a traffic stop (when or where is not detailed in the affidavit), which they eventually associated with drug trafficking in the Detroit area facilitated principally by Sanchez Alcaraz and Maldonaldo Ortiz.  The warrant affidavit is light on details connecting Alcaraz and Ortiz to any drug transactions; however the leading charges here are money laundering and conspiracy to launder drug proceeds, and there are ample facts in the record connecting Alcaraz, Ortiz, and Gregory to suspected criminal cash transactions.

Second, agents conducted surveillance that directly connected Alcaraz and Ortiz to transfers of large sums of currency that the pair sought to have laundered illegally through third parties.  On February 29, March 7, and March 16, 2020, Alcaraz and Ortiz were directly observed handing off large sums of cash (between $150,000 and $400,000) to identified individuals who immediately took the currency to banks to deposit.  On the third occasion, agents intervened and inserted an undercover investigator who offered to launder the money, and he was given $150,000 in cash by Alcaraz and Ortiz in a handoff similar to those that were observed with the other identified individuals.  That transaction directly confirmed agents' suspicions that the preceding two exchanges also were for the purpose of illegally laundering large sums of money.

Third, preceding the observed currency handoffs by Alcaraz and Ortiz to the suspected money launderers and an undercover agent posing as the same, agents witnessed Alcaraz and Ortiz

receiving boxes that they suspected contained large amounts of currency, which were the proceeds that in each instance Alcaraz and Ortiz were seen handing off to be laundered three days after each handoff by Gregory to Alcaraz and Ortiz. Investigators may rely on circumstantial evidence to develop probable cause. *Sanders*, 106 F.4th at 462. Here, they observed Alcaraz and Ortiz in possession of large sums of currency, which they sought to have illegally laundered, confirmed through a staged transaction with an undercover agent, within several days after the same persons were observed receiving from the defendant containers of suitable size to contain the same contraband currency. Those circumstances establish a fair probability that Gregory supplied the cash to Alcaraz and Ortiz, who then passed it on to others to be illegally laundered. The surveillance, staged transaction, and the investigators' knowledge and experience about how such transactions usually are carried out all are proper premises for developing a sound circumstantial suspicion. *Id.* at 461-62 ("[T]here are other time-honored markers [of grounds for probable cause] in [the] Fourth Amendment jurisprudence too, including tips to the police, controlled buys, trash pulls, police surveillance, exploration of a suspect's criminal history, and averments about an officer's training and experience.").

Fourth, there were sufficient observations connecting the Kia Soul to the observed routine of handoffs of suspected drug proceeds by Gregory to Alcaraz and Ortiz. Gregory was seen in each of three instances as driver or passenger in the same vehicle, which was registered to his Manor Street residence. Gregory was seen on each of the three occasions meeting up with Alcaraz and Ortiz, who drove the same white Ford F-150 pickup truck to the same rendezvous location on Snowden Street. Each time, Gregory removed boxes from his vehicle and conveyed them to Ortiz, who put them in the white pickup, after which the participants returned to their vehicles and left the area. Gregory was spotted at the Manor Street address, and the Kia Soul also was seen parked

there.  Finally, on the date of the traffic stop, Gregory was seen leaving the Manor Street residence driving the Kia Soul, and he was followed while he proceeded to pick up his wife from work, and then began driving toward Snowden Street where the prior handoffs had occurred.  At the same time, agents tailing Alcaraz and Ortiz saw them en route to the Snowden Street rendezvous point.  It was reasonable to conclude based on those circumstances that a repeat of the prior handoffs was in progress, and that upon arrival Gregory would again produce boxes of suspected currency.  Based on all of those observations, there was a fair probability that a quantity of contraband currency would be found in the vehicle as it approached the Snowden Street rendezvous point.  All of that supplied probable cause for an immediate seizure and search of the car.

But even if investigators did not have probable cause for a search of the car in the first instance, they certainly did once the car was stopped.  All of the same facts discussed above established reasonable suspicion to justify at the least an investigative stop of the car.  *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) ("An officer may detain an individual for a short time for investigatory purposes if, under the totality of the circumstances, he has 'reasonable suspicion,' that is, 'a particularized and objective basis for suspecting the particular person . . . of criminal activity based on specific and articulable facts.'") (quoting *Hoover v. Walsh*, 682 F.3d 481, 494 (6th Cir. 2012); citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  "Reasonable suspicion 'is obviously less demanding than . . . probable cause,' which itself 'is not a high bar' and one that requires only a 'substantial chance of criminal activity.'"  *United States v. McCallister*, 39 F.4th 368, 374 (6th Cir. 2022) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *D.C. v. Wesby*, 583 U.S. 48, 56-57 (2018)).  "And both reasonable suspicion and probable cause fall below the preponderance of the evidence standard, which requires criminal activity to be 'more likely than not.'"  *Ibid.* (quoting *Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020)).  It is well settled that a

warrantless traffic stop may be conducted when a police officer has reasonable suspicion of an ongoing crime or a completed felony. *United States v. Sanford*, 476 F.3d 391, 394-95 (6th Cir. 2007).

Here, there were specific articulable facts, discussed above, that justified an investigative stop of the vehicle in which Gregory was riding, as it was headed to a fourth rendezvous for another suspected currency handoff. As soon as the vehicle was stopped, agents saw boxes on the back seat, and in one they spotted a large quantity of U.S. currency. That observation sufficed to ripen the reasonable suspicion of currency trafficking into probable cause for a full search of the vehicle. And that search permissibly included opening and looking inside the boxes. *Watson*, 142 F.4th at 881.

However one views the government agents' level of knowledge, the stop of the Kia Soul on April 15, 2020 did not violate the Fourth Amendment, and the ensuing search and seizure of property was justified by probable cause and the automobile exception to the Fourth Amendment. Gregory's motion to suppress the fruits of that search will be denied.

III.

In his second motion, Gregory attacks the search warrant affidavit as failing to establish that there was probable cause to believe that evidence of money laundering would be found in his house. He reasons that the affidavit does not support any connection of the illegal conduct to his house because none of the drug trafficking activity allegedly observed occurred at the residence, none of the transfers of drug trafficking proceeds allegedly observed occurred at the residence, and the boxes suspected of containing currency were never seen being brought to the home.

The parties agree on the basics. Well established Fourth Amendment jurisprudence endorses a preference for search warrants before law enforcement officials may search a person's

dwelling.  *Georgia v. Randolph*, 547 U.S. 103, 117 (2006) (acknowledging "the law's general partiality toward 'police action taken under a warrant [as against] searches and seizures without one'") (quoting *United States v. Ventresca*, 380 U.S. 102, 107 (1965)); *see also United States v. Lefkowitz*, 285 U.S. 452, 464 (1932) ("[T]he informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers."), *abrogated on other grounds by Harris v. United States*, 331 U.S. 145 (1947), *as recognized in Arizona v. Gant*, 556 U.S. 332, 350 (2009).  The Founders believed that inserting a neutral and detached judicial officer between the police and the citizens would promote the values that are enshrined in the Fourth Amendment. *Johnson v. United States*, 333 U.S. 10, 14 (1948) ("[The Fourth Amendment's] protection consists in requiring that those inferences [supporting probable cause] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.").  A search warrant may issue if the magistrate finds probable cause to believe that particular evidence of a crime will be found in the place to be searched. *United States v. Grubbs*, 547 U.S. 90, 95 (2006).  That finding must be based on information furnished by an affiant under oath.

"Probable cause exists if 'the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched.'"  *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018) (quoting *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996)).

"Because probable cause is not a 'high bar,' it follows that a warrant's validity should not turn on whether it is supported by an 'actual showing' of criminal activity at the targeted location." *Sanders*, 106 F.4th at 462 (quoting *D.C. v. Wesby*, 583 U.S. 48, 57 (2018); citing *Christian*, 925

F.3d at 311) (cleaned up)).  "[I]nstead [the Court must] ask whether officers provided direct or circumstantial support to create 'more than mere suspicion' that contraband will be found at the location in question."  *Ibid.* (quoting *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000)).  "Likewise, [the Court does] not ask whether other investigative methods were available to officers," and "[i]nstead, [the] touchstone is simply whether the chosen means of investigation produced information that, as detailed in a warrant affidavit, adequately supports a finding of probable cause."  *Id.* at 462-63 (citing *Christian*, 925 F.3d at 310).  "In other words, [the Court must] value the affidavit as we might those around us[;] [asking] what good qualities it contains, not 'what it lacks.'"  *Id.* at 463 (quoting *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc)).  "Critically, [the Court does] not scrutinize a warrant affidavit in a 'hypertechnical' or 'line-by-line' manner."  *Ibid.* (citing *Wesby*, 583 U.S. at 61; *Christian*, 925 F.3d at 311; *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004)).  "The proper approach, rather, is a holistic one.  [The Court] consider[s] the totality of the circumstance's constellation underlying probable cause, viewing each data point as a star in the collection."  *Ibid.* (cleaned up).  As a corollary, the Court's "review [of the probable cause determination is] limited to the facts in the affidavit" presented to secure the warrant; this limiting principle often is framed as constraining the Court's consideration to information within the "four corners" of the affidavit.  *United States v. McCarley-Connin*, 148 F.4th 808, 815 (6th Cir. 2025).

Here, there are ample facts in the affidavit to demonstrate a connection between criminal activity and the home.  First, and most conspicuously, the car search resulted in the seizure of more than $450,000 in currency from the defendant's wife's car in which defendant was a passenger.  As discussed above, that seizure confirmed agents' suspicions that they had seen Gregory engage in a series of handoffs of large quantities of cash to Alcaraz and Ortiz, which the two then passed

on to others to be laundered.  On the date of the traffic stop, Gregory was seen leaving the Manor Street residence in the car.  He was followed en route while he stopped to pick up his wife from work, who got into the car carrying only her purse.  No boxes were seen being loaded into the car at any point during the trip, but boxes were spotted immediately when the car was pulled over on Snowden Street near the site of the three prior handoffs.  Those boxes contained large sums of U.S. currency, and a dog alert confirmed the presence of narcotics residue, bolstering the suspicion that the money was proceeds of illegal drug dealing.  Evidence that a suspect leaves a place and proceeds to a different location to engage in an illegal transaction suffices to establish a connection between the criminal activity and the point of origin.  *Sanders*, 106 F.4th at 463 ("Evidence that one leaves a residence, engages in a drug transaction, and then returns into the residence plainly demonstrates a sufficient nexus with the location.") (citing *United States v. Jones*, 817 F.3d 489, 492 (6th Cir. 2016) ("What matters is . . . that [the defendant] left [the location to be searched] and drove straight to a drug deal in which he was the seller.")).  Moreover, the presence of the money and detected presence of drug residue from a dog alert was sufficient to support an inference that the large quantity of currency seized was derived from illegal drug dealing.  *United States v. Padilla*, 888 F.2d 642, 644 (9th Cir. 1989) ("Circumstantial evidence of drug transactions may support the establishment of probable cause.  We have said that in assessing probable cause an extremely large amount of money found in the household itself is strong evidence that the money was furnished or intended to be furnished in return for drugs.  However, the test requires more than the mere existence of a large amount of cash to establish a connection between that cash and illegal drug transactions; the money must be in combination with other persuasive circumstantial evidence.  Particularly persuasive is the presence of drugs or drug paraphernalia.").

Second, Gregory was seen multiple times in the same car transporting boxes suspected of containing (and on the last occasion confirmed as containing) large sums of currency.  He also was spotted at the Manor Street residence, and the vehicle was seen parked there, and was known to be registered to Gregory's wife at the Manor Street address.  It was reasonable for investigators to conclude that large sums of illegally obtained cash transported in the vehicle would be stored inside the residence for safekeeping, not in a parked car outside.  *Sanders*, 106 F.4th at 463 ("Officers twice witnessed Sanders drive away from the meet location with buy money, park his car, and go straight into the apartment.  Other than reaching the unlikely conclusion that Sanders left those amounts in his vehicle parked outside, it was fair for officers to assume based on the evidence before them that the proceeds were taken into the apartment.").

And then there are the bonus facts.  Following the April 15, 2020 stop and seizure of currency from the vehicle in which defendant was a passenger, agents developed additional links between the Manor Street premises and suspected trafficking in funds to be laundered.  The suspect denoted as "Person 4" was detained twice while traveling and on both occasions consented to a search of his luggage in which large sums of U.S. currency were found.  On the second occasion, the suspect lied about having cash with him, only for the same to be found once a consented search of his luggage was carried out.  On both occasions, Person 4 produced a Michigan driver license which listed his address as the same Manor Street home where Gregory and his wife resided.  For the second trip, Gregory's wife made and twice rescheduled the travel reservations.  Those additional seizures of currency from a second suspect whose identification had him residing at the Manor Street home provide additional circumstantial connections to the premises.

Based on all of the above facts recited in the warrant affidavit, there was a sufficient basis to establish a nexus between the Manor Street premises and two persons suspected of illegally

- 17 -

- 18 -

transporting drug trafficking proceeds to be laundered.  The affidavit established probable cause justifying the issuance of the search warrant.

IV.

The facts in the record in this case support a finding of probable cause to search the vehicle on April 15, 2020, and to issue the search warrant for the Manor Street house.  The seizure of evidence in both searches did not violate the Fourth Amendment.

Accordingly, it is **ORDERED** that the defendant's motions to suppress evidence (ECF No. 101, 102) are **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  February 11, 2026